OPINION
{¶ 1} Defendant-appellant, Ronald L. Dillon, appeals from his conviction for one count of workers' compensation fraud, a violation of R.C. 2913.48(A). For the following reasons, we affirm.
 {¶ 2} On April 16, 2001, Dillon injured his right shoulder while performing his duties as a truck driver for Martinbird Enterprises, Inc. ("Martinbird"). That same day, Dillon completed a "First Report of an Injury, Occupational Disease or Death" ("FROI") form to initialize a claim for workers' compensation benefits. At the top of the FROI form, the following warning appeared:
WARNING:
Any person who obtains compensation from BWC or self-insuring employers by knowingly misrepresenting or concealing facts, making false statements, or accepting compensation to which he/she is not entitled, is subject to felony criminal prosecution for fraud.
(Emphasis sic.)
 {¶ 3} Upon receipt of the FROI form, the Bureau of Workers' Compensation ("BWC") tasked Colleen Carman, a claims service specialist, with determining which benefits, if any, to award Dillon. On April 25, 2001, Carman telephoned Dillon to review the information contained in his FROI form and to discuss his medical treatment. At trial, Carman testified that, during this conversation, she asked Dillon if he was employed anywhere other than Martinbird, and Dillon replied "no."
 {¶ 4} In addition to speaking to Dillon, Carman also reviewed a form completed by Dillon's physician in which the physician indicated that Dillon was unable to return to his position at Martinbird. Based the information Carman obtained from Dillon and his physician, Carman determined that Dillon was entitled to temporary total disability ("TTD") benefits. On April 27, 2001, the BWC issued its first payment to Dillon — a warrant for $231.43 to compensate him for the wages he lost from April 17, 2001 to April 21, 2001 because of his injury.
 {¶ 5} An injured worker cannot receive TTD benefits if he is working. Carman informed Dillon of this prohibition in an April 27, 2001 letter,[1] which read in part:
[A]ccording to workers' compensation law, you are not entitled to temporary total benefits if:
(1) You return to any type of work including full-time, part-time, self-employment, and commission work with any employer. This includes employers other than the one you worked for when you were injured[.]
Additionally, the 23 warrants the BWC issued to Dillon between April 27, 2001 and October 11, 2001 also warned Dillon of the prohibition against working. On the back of each warrant, immediately above the line on which Dillon signed, the warrant stated the following:
NOTICE — READ BEFORE SIGNING
 WARNING — * * * If this check is to compensate you for total disability, you are not entitled to it if you are working. Therefore, you should return it to the BWC immediately. * * *
(Emphasis sic.)
 {¶ 6} Contrary to what he told Carman during their April 25, 2001 telephone conversation, Dillon was working. Although Dillon's injury prevented him from driving a truck for Martinbird, he continued to work his second job as a real estate agent for Woeste Realty ("Woeste"). Dillon had obtained his real estate salesperson license in December 2000, and he had begun working for Woeste on January 2, 2001. Even as Dillon received TTD benefits, he listed and marketed his first property.
 {¶ 7} By October 2001, Dillon's shoulder injury had healed, and his physician released him to return to work at Martinbird with some restrictions. Dillon's TTD benefits ceased the day he returned to Martinbird. According to Dillon, he reinjured his shoulder on that first day back on the job, but he continued to work until his November 27, 2001 appointment with his physician. After examining Dillon's shoulder, Dillon's physician again found him to be unable to work. Within a week, the BWC resumed issuing Dillon TTD benefits.
 {¶ 8} Beginning with the warrant the BWC issued to Dillon on December 3, 2001, the warning language on the back of the warrant changed. Instead of the text quoted above, the warrant read:
NOTICE — READ BEFORE SIGNING
 WARNING — If this warrant is to compensate you for permanenttotal disability, temporary total disability, living maintenanceor wage loss not working benefits, you are not entitled to it if you are working. Therefore, you should return this warrant to the BWC immediately or risk criminal felony prosecution.
(Emphasis sic.) Dillon received, signed, and cashed 21 warrants containing this warning.
 {¶ 9} In December 2001, Dillon began physical rehabilitation to recondition his shoulder. Because Dillon was participating in a rehabilitation program, the BWC stopped issuing Dillon TTD benefits and instead issued him living maintenance ("LM") benefits. Like the eligibility requirements for TTD benefits, the eligibility requirements for LM benefits prohibit the recipient from working.
 {¶ 10} In addition to switching Dillon to LM benefits, the BWC referred Dillon to Integrated Benefits Management ("IBM"), a company that assisted injured workers in re-integrating into the work force. IBM assigned Dillon's case to Cathleen Adams, a vocational rehabilitation case manager. Adams met with Dillon in January 2002 to assess his employment and medical history. During this meeting, Adams asked Dillon to recount his employment experience. According to Adams, in answering, Dillon failed to disclose his real estate salesperson license or his job with Woeste.
 {¶ 11} Over the next four months, Adams developed multiple vocational rehabilitation plans for Dillon. Despite Adams' help with job placement, Dillon reported a lack of success in finding a new job. On June 16, 2002, Adams closed Dillon's file.
 {¶ 12} Meanwhile, Martinbird reported to the BWC that Dillon was working as a real estate agent while he was receiving workers' compensation benefits. James Snyder, a special agent with the BWC Special Investigations Unit, investigated Martinbird's allegation. Snyder conducted surveillance of Dillon twice, and both times he observed Dillon attending meetings at Woeste's office.
 {¶ 13} Snyder's second surveillance of Dillon occurred on the morning of May 7, 2002. That same morning, Carman received a telephone call from Dillon. As they talked, Carman heard a loudspeaker in the background making work-related announcements, such as "pick up line two." Carmen asked Dillon where he was calling from, and Dillon told her he was visiting a friend at Woeste. Carmen then asked Dillon if he could obtain a job at Woeste. In response, Dillon did not tell Carman of his ongoing employment with Woeste, but rather, said that he might try to apply for a job there in the future.
 {¶ 14} As part of Synder's investigation, he also spoke with Mark Evans, the then sales manager for Woeste. Evans told Snyder about a conversation he had with Dillon; a conversation Evans also recounted at trial. Evans testified that Dillon asked him if he could receive workers' compensation benefits and simultaneously sell real estate. Evans said that he did not believe so and directed Dillon to contact the BWC with his question. According to Carman, Dillon never raised this question.
 {¶ 15} The BWC last issued a warrant to Dillon on July 3, 2002. In total, Dillon received $18,987.48 in TTD and LM benefits, covering the period from April 17, 2001 to October 6, 2001 and November 27, 2001 to June 16, 2002. The BWC also paid $6,011.80 for the vocational rehabilitation services that IBM provided to Dillon.
 {¶ 16} On January 15, 2004, Dillon was indicted on one count of workers' compensation fraud. After seven continuances, a jury trial commenced on March 1, 2005. The jury returned a guilty verdict. In its April 29, 2005 judgment entry, the trial court sentenced Dillon to five years of community control and ordered him to pay $24,999.28 in restitution. Dillon now appeals from this judgment entry.
 {¶ 17} On appeal, Dillon assigns the following errors:
[1.] The jury verdict was not supported by sufficient credible evidence and was against the manifest weight of the evidence. As a result, Appellant was denied due process protections under the state and federal Constitutions.
[2.] The trial court committed [sic] erroneously instructed the jury on the element of intent, thereby, denying Appellant due process under the state and federal Constitutions.
[3.] A criminal defendant is denied effective assistance of counsel under the Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution when counsel fails to timely file a motion for discharge because the defendant is not brought to trial within the statutory speedy trial limits.
[4.] The trial court erred in ordering restitution for temporary total disability benefits paid by the Bureau of Workers' Compensation for the period prior to Appellant's receipt of earnings.
 {¶ 18} By his first assignment of error, Dillon challenges both the sufficiency of the evidence supporting his conviction and the manifest weight of that evidence. The legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different. State v. Thompkins
(1997), 78 Ohio St.3d 380, paragraph two of the syllabus. Therefore, we will discuss Dillon's sufficiency of the evidence and manifest weight arguments separately.
 {¶ 19} First, with respect to Dillon's sufficiency of the evidence argument, the operative inquiry is whether the evidence is adequate to sustain a verdict. Id., at 386-387. When reviewing the sufficiency of the evidence, an appellate court must:
[E]xamine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. * * *
State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. This test raises a question of law and does not allow the court to weigh the evidence. Thompkins, at 386;State v. Thomas (1982), 70 Ohio St.2d 79, 79-80. Rather, the sufficiency of the evidence test "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v.Virginia (1979), 443 U.S. 307, 319. Consequently, when reviewing the sufficiency of the evidence, an appellate court must accept the fact finder's determination with regard to the credibility of the witnesses. State v. Yarbrough, 95 Ohio St.3d 227,2002-Ohio-2126, at ¶ 79; State v. Worrell, Franklin App. No. 04AP-410, 2005-Ohio-1521, at ¶ 41 ("In determining whether a conviction is based on sufficient evidence, we do not assess whether the evidence is to be believed, but, whether, if believed, the evidence against a defendant would support a conviction.").
 {¶ 20} A trier of fact must convict a defendant of workers' compensation fraud if the state proves beyond a reasonable doubt that the defendant, "with purpose to defraud[,] * * * (1) [r]eceive[d] workers' compensation benefits to which [he] [was] not entitled; [or] (2) [made] * * * a false or misleading statement with the purpose * * * to secure workers' compensation benefits." R.C. 2913.48(A)(1) and (2). "Defraud" means "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(B). A defendant commits "deception" when he:
[K]nowingly deceiv[es] another or caus[es] another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact.
R.C. 2913.01(A).
 {¶ 21} In the case at bar, Dillon argues that this court should vacate his sentence because the record does not contain any evidence that he purposefully intended to defraud the BWC. To support his argument, Dillon points to his testimony that he did not know that his employment with Woeste made him ineligible for the benefits he received. Given his ignorance, Dillon maintains that he could not form the intent to deceive the BWC in order to obtain the benefits. We disagree.
 {¶ 22} A trier of fact can determine intent from the surrounding facts and circumstances. State v. Seiber (1990),56 Ohio St.3d 4, 13-14; State v. Drayer, 159 Ohio App.3d 189,2004-Ohio-6120, at ¶ 9 ("[A] jury may look to circumstantial evidence to find proof of purpose."). Here, although Dillon testified that he was unaware of his ineligibility for the workers' compensation benefits he received, a plethora of circumstantial evidence proves otherwise. Not only did Carman send Dillon two letters informing him that he was not entitled to TTD benefits if he returned to any type of work, but additionally, the warrants Dillon signed warned him that he could not work and receive TTD or LM benefits. Further, even if Dillon was confused by or ignored the letters and warrants, Evans, Woeste's sales manager, told Dillon that he did not believe Dillon could receive benefits while working as a real estate agent for Woeste. Accordingly, we conclude that the state offered evidence sufficient to convince a rational trier of fact that Dillon knew he was ineligible for the benefits he received, and thus, he purposefully defrauded the BWC.
 {¶ 23} By his first assignment of error, Dillon also argues that his conviction is against the manifest weight of the evidence. When presented with a challenge to the manifest weight of the evidence, an appellate court, after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"Thompkins, supra, at 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most "`exceptional cases in which the evidence weighs heavily against conviction.'" Id.
 {¶ 24} A defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. State v. Williams, Franklin App. No. 02AP-35, 2002-Ohio-4503, at ¶ 58. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must also give great deference to the fact finder's determination of the witnesses' credibility. State v. Covington, Franklin App. No. 02AP-245, 2002-Ohio-7037, at ¶ 28.
 {¶ 25} The success of Dillon's manifest weight argument depends upon this court accepting his testimony that he did not know he was ineligible for the workers' compensation benefits he received. If this court were to credit Dillon's testimony over the state's evidence, then we necessarily would have to find that Dillon did not intend to defraud the BWC. However, we, like the jury, find that Evans' testimony, the letters, and the warrants are persuasive, credible evidence that Dillon was aware that he could not work and simultaneously receive the benefits at issue. Accordingly, we conclude that this is not the exceptional case requiring reversal on manifest weight grounds.
 {¶ 26} Because the jury's verdict is supported by sufficient evidence and is not against the manifest weight of the evidence, we overrule Dillon's first assignment of error.
 {¶ 27} By his second assignment of error, Dillon argues that the trial court erroneously instructed the jury that it could find Dillon guilty if he acted knowingly when R.C. 2913.48(A) requires the state to prove he acted purposefully. We disagree.
 {¶ 28} Because Dillon did not object to inclusion of the definition of "knowingly" in the jury instructions, we must review the trial court's decision under the plain error standard. See Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."). See, also, State v. Hill (2001),92 Ohio St.3d 191, 196. In order to find plain error, an appellate court must determine that the outcome of the trial clearly would have been different but for the trial court's improper actions.State v. Waddell (1996), 75 Ohio St.3d 163, 166. However, even if an appellate court finds plain error, it is not required to correct it. State v. Barnes (2002), 94 Ohio St.3d 21, 27. Indeed, plain error should be noticed and corrected "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long
(1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
 {¶ 29} In the case at bar, the trial court instructed the jury as follows:
The defendant, Ronald Dillon, is charged with workers' compensation fraud. Before you can find the defendant guilty of this count, you must find beyond a reasonable doubt that from on or about April 17 of 2001 to on or about June 16th, of 2002, in Franklin County, Ohio, the defendant with purpose to defraud, did receive workers' compensation benefits to which he was not entitled, and/or did make or present or cause to be presented to be made or presented false or misleading statements with the purpose to secure payment for goods or services rendered, relating to being an injured worker or to secure workers' compensation benefits.
(Tr. at 307-308.) The trial court then instructed the jury on the definition of "purposefully." Next, the trial court turned to the meaning of "defraud," and instructed the jury that "defraud" meant "to knowingly obtain by deception some benefits for one's self or another, or to knowingly cause by deception some detriment to another." (Tr. at 311.) The trial court also instructed the jury on the "knowingly" culpable mental state.
 {¶ 30} Contrary to Dillon's argument, nowhere in the jury instructions did the trial court substitute "knowingly" for "purposefully." Rather, the trial court's instructions mirror the language contained in R.C. 2913.48(A). The trial court charged the jury that it had to find that Dillon acted "with purpose to defraud," and it only included the definition of "knowingly" in the instructions because the statutory definition of "defraud" includes that word. See R.C. 2913.01(B) (quoted above). Therefore, we conclude that the trial court did not err, much less commit plain error, in instructing the jury.
 {¶ 31} Accordingly, we overrule Dillon's second assignment of error.
 {¶ 32} By Dillon's third assignment of error, he argues that he is entitled to a reversal of his conviction because his counsel rendered ineffective assistance. In order to achieve a reversal on ineffective assistance grounds, a defendant must show, first, that "counsel's performance was deficient" and, second, that "the deficient performance prejudiced the defense * * * so as to deprive the defendant of a fair trial."Strickland v. Washington (1984), 466 U.S. 668, 687. A counsel's performance is deficient if it falls "`below an objective standard of reasonable representation.'" State v.Hill (1996), 75 Ohio St.3d 195, 211, quoting State v.Bradley, 42 Ohio St.3d 136, paragraph two of the syllabus. Here, Dillon asserts his attorney's representation fell below this objective standard when he did not move to dismiss the indictment on statutory speedy-trial grounds. We disagree.
 {¶ 33} R.C. 2945.71(C)(2) provides that an individual charged with a felony offense must be brought to trial within 270 days. In the case at bar, because Dillon was not arrested in connection with the commission of his crime, Dillon's speedy-trial time began to run when he was served with the indictment — September 20, 2004. State v. Galluzzo, Champaign App. No. 2004 CA 25,2006-Ohio-309, at ¶ 30; State v. Riley, 162 Ohio App.3d 730,2005-Ohio-4337, at ¶ 20. Dillon was brought to trial on March 1, 2005. Between the service of the indictment and the commencement of trial, 406 days elapsed.
 {¶ 34} As the interim between service and the trial exceeded 270 days, we must ascertain whether there are any exceptions that would toll the speedy-trial time. State v. Olverson, Franklin App. No. 02AP-554, 2003-Ohio-1274, at ¶ 36. Pursuant to R.C.2945.72(H), "any continuance granted on the accused's own motion * * *" tolls the 270-day time period for the length of the continuance. Further, a defendant's written waiver of his speedy-trial rights also tolls the speedy-trial time, as long as the defendant makes the waiver knowingly and voluntarily. Statev. King, 70 Ohio St.3d 158, 160, 1994-Ohio-412.
 {¶ 35} The record indicates that of the seven continuances in this case, the trial court granted two upon the motion of the parties. Specifically, the journal entries show that the trial court granted continuances upon joint motions for the periods of April 5, 2004 to May 17, 2004 and July 13, 2004 to August 2, 2004. Because these continuances were requested, in part, by Dillon, they tolled the speedy-trial time for 62 days. R.C.2945.72(H).
 {¶ 36} In addition to the continuances that the parties jointly requested, the record also indicates that the state requested two continuances and the trial court three. Of the judgment entries granting these five continuances, Dillon signed four, all of which contained language providing that "[d]efendant waives the right to a speedy trial for the period of this continuance * * *." Thus, Dillon waived his speedy-trial rights for the period of August 2, 2004 to March 1, 2005, tolling the speedy-trial time for a total of 210 days.
 {¶ 37} After calculating the relevant periods, we conclude that the speedy-trial time was tolled for 272 days. Thus, for statutory speedy-trial purposes, Dillon was brought to trial within 134 days — within the 270-day time limitation. Without a basis on which to assert a statutory speedy-trial motion, Dillon's attorney was not ineffective in failing to file such a motion. Accordingly, we overrule Dillon's third assignment of error.
 {¶ 38} By his fourth assignment of error, Dillon argues that the trial court erred in ordering him to pay restitution that included an amount for the TTD benefits he received for the period of April 17, 2001 to October 6, 2001. We disagree.
 {¶ 39} R.C. 2929.18(A)(1) authorizes a trial court to order an offender to pay restitution in an amount based on the victim's economic loss. Specifically, R.C. 2929.18(A)(1) states that "the amount the court orders as restitution shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense." The state must prove the amount of this economic loss with competent, credible evidence from which the trial court can calculate the amount of restitution within a reasonable degree of certainty.State v. Aliane, Franklin App. No. 03AP-840, 2004-Ohio-3730, at ¶ 14.
 {¶ 40} In the case at bar, Dillon maintains that because he did not receive any commissions for his work as a real estate agent from April 17, 2001 to October 6, 2001, he did not commit workers' compensation fraud during that period. Thus, Dillon reasons that the trial court improperly ordered him to pay restitution for benefits he lawfully received. This reasoning, however, contains a fatal flaw. The amount of compensation Woeste paid Dillon was irrelevant to whether Dillon committed workers' compensation fraud. Dillon was not entitled to the benefits he received because he was working for Woeste, regardless of the level of compensation Woeste paid him. As Dillon lied about his status as an employee of Woeste from the beginning and he continued to work for Woeste throughout the period during which he received benefits, the BWC's economic loss includes all of the benefits it paid Dillon. Accordingly, we overrule Dillon's fourth assignment of error.
 {¶ 41} For the foregoing reasons, we overrule all of Dillon's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Petree and Brown, JJ., concur.
[1] On September 13, 2001, Carman sent Dillon another letter containing language identical to the April 27, 2001 letter.